UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JENNIFER THOMAS                                                                                    PLAINTIFF

      VS.                                      Civil No. 2:14-cv-02126-MEF

CAROLYN W. COLVIN,                                                                              DEFENDANT
Commissioner of Social Security Administration

## MEMORANDUM OPINION

Plaintiff, Jennifer Thomas, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §423(d)(1)(A), 1382c(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. §405(g).

### I.     Procedural Background:

Plaintiff filed her application for SSI on October 20, 2011, alleging an onset date of February 20, 1999, due to migraines, knee pain, depression, anger issues, and social phobia. (T. 149) Plaintiff's application was denied initially and on reconsideration. (T. 71-74, 78-80). Plaintiff then requested an administration hearing, which was held in front of Administrative Law Judge ("ALJ"), Harold D. Davis, on May 23, 2013. At the hearing Plaintiff requested and the ALJ approved to amend the onset date to October 20, 2011.

At the time of the hearing Plaintiff was 35 years of age, possessed the equivalent of a high school education, and had completed some college level courses. (T. 15, 34, 150) Her past relevant work experience included working as a sandwich maker at a fast food restaurant from March 1994

1

through January 2000, and from June 30, 2004 to July 12, 2004, babysitter in 2006, a general laborer in factories from 2007 through 2009, and a housekeeper in 1996. (T. 38, 150)

On July 26, 2013, the ALJ found Plaintiff's hypertension, carpal tunnel syndrome (bilateral), sacroiliitis, obesity and depression severe. (T. 12) Considering the Plaintiff's age, education, work experience and the residual functional capacity ("RFC") based upon all of her impairments, the ALJ concluded Plaintiff was not disabled from October 20, 2011 through July 26, 2013. The ALJ determined Plaintiff had the RFC to perform light work, except she could perform jobs requiring only frequent use of the hands and/or fingers, and jobs limited to simple tasks with simple instructions. (T. 15)

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on April 30, 2014. (T. 1-4) Plaintiff then filed this action on May 28, 2014. (Doc. 1) This case is before the undersigned pursuant to consent of the parties. (Doc. 8) Both parties have filed briefs, and the case is ready for decision. (Doc. 10 and 11)

## II.     Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart,* 292 F.3d. 576, 583 (8th Cir. 2002). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox, v. Asture,* 495 F.3d 617, 617 (8th Cir. 2007). The AJL's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d, 964, 966 (8th Cir. 2003).   The Court considers the evidence that "supports as well as detracts from the

Commissioner's decision, and we will not reverse simply because some evidence may support the opposite conclusion." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008). If after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel,* 221 F.3d at 1068.

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairments, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

If such an impairment exists, the ALJ must determine whether the claimant has demonstrated that she is unable to perform either her past relevant work, or any other work that exists in significant numbers in the national economy. (20 C.F.R. §416.945). The ALJ applies a five-step sequential evaluation process for determining whether an individual is disabled. (20 C.F.R. §404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker,* 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §404.150, 416.920 (2003).

### III.     Evidence Presented:

The medical evidence is as follows.

On December 10, 2003, Plaintiff went to UAMS Family Medical Center ("UAMS") for a well woman exam, and complained of migraines. (T. 461) Plaintiff was prescribed Atenolol for her migraines. (T. 461) Almost a year later, December 13, 2004, Plaintiff was prescribed Zomig for her migraines. (T. 452)

On April 22, 2008, Plaintiff complained of knee pain.  An MRI conducted on May 9, 2008, showed a tear involving the posterior horn of the lateral meniscus.  There was a type 1 hyerintense signal in the posterior horn of the medial meniscus without evidence of a tear. (T. 686) Another MRI of Plaintiff's knee on November 14, 2008, showed a subacute to chronic tear of the anterior cruciate ligament.  The globular signal intensity anteriorly in the intercondylar notch appeared to represent the retracted torn anterior cruciate ligament.  Plaintiff had a mild posterolateral tibial contusion without fracture line. (T. 684-685).

On November 23, 2010, Plaintiff went to UAMS to refill her prescriptions.  At the time of the examination, Plaintiff denied depression and anxiety.  Plaintiff took Maxalt, as needed for her headaches.  Plaintiff had not been seen at UAMS since 2006, she was prescribed Celexa, and Maxalt and Hydrochlorothiazide were refilled. (T. 275-276)

On October 17, 2011, Plaintiff contacted UAMS for refills of her prescriptions.  LPN Melissa Bell told Plaintiff she had several no show appointments, which was grounds for dismissal from the clinic, it was her responsibility to keep the appointments and no further refills would be given without an appointment. (T. 374)

Plaintiff saw Dr. Lyndsey Kramp at UAMS on October 31, 2011, to refill her prescriptions.  Notes indicated Plaintiff had a "spotty" clinic record with only irregular attendance. (T. 288)

Plaintiff complained of headaches, but denied tingling. (T. 288) Plaintiff's hypertension was under good control on Hydrochlorothiazide, while her depression had deteriorated, therefore Dr. Kramp increased Celexa. (T. 290)

Plaintiff had two more abscesses on her abdomen and sought treatment from Dr. Kramp on December 14, 2011. (T. 390) At the time of the examination, Plaintiff denied chest pain with exertion, shortness of breath, palpitations, syncope, dizziness, headaches, edema, weight loss, weight gain, nausea, vomiting, excessive sweating and thirst. (T. 390) Dr. Kramp's observation indicated there was nothing to drain from the abscesses, treated the abscesses with Bactrim, hot compress and follow up in one week. (T. 391)

Plaintiff complained of hand numbness and tingling in the left fourth and fifth digit for several months, depression, migraines, elevated blood pressure, snoring, insomnia and daytime sleepiness on March 22, 2012. (T. 398) In reviewing the symptoms, Plaintiff denied headaches. (T. 398) Dr. Kramp ordered a bilateral nerve conduction study, a sleep study, noted her depression was stable, but her hypertension had deteriorated. (T. 400)

On March 29, 2012, Plaintiff had a nerve conduction study performed by Dr. Duane L. Birky, neurologist at Sparks Heath System.  The study was abnormal, as there was evidence of mild median neuropathy at the wrist bilaterally. (T. 309) Plaintiff was diagnosed with bilateral carpal tunnel syndrome and referred to an orthopedic surgeon on April 2, 2012. (T. 404)

On May 1, 2012, Plaintiff went to Mercy Clinic Orthopedic Fort Smith, due to bilateral hand numbness. (T. 331) Dr. Steven Smith, orthopedic surgeon, observed both hands showed equivocal findings for carpal tunnel syndrome, and numbness in the ulnar fifth digit on the left side.  Plaintiff was placed in cock-up splints. (T. 332)

On June 20, 2012, Plaintiff saw Dr. Kramp for a well woman visit where she complained of lumbar back pain with shooting pains down both of her legs from lifting a heavy box several months ago. (T. 411) Plaintiff wanted to stop smoking and requested the patch. (T. 411) Dr. Kramp observed Plaintiff was well-developed, well-nourished, had a normal heel-toe gait pattern, however she did have tenderness over lumbar muscle area. (T. 413) Dr. Kramp ordered an MRI of the lumbar spine, prescribed a nicotine patch, and set up counseling at Perspectives Behavioral Health Management ("Perspectives") for Plaintiff's depression. (T. 413)

On July 3, 2012, the results of the MRI showed early degenerative changes of the lower lumbar spine with desiccation of the disc at level of L4-L5. There was no spondylolysis or spondylolisthesis. The conus medullaris terminated normally at the level of L1. There was right paracentral bulging of disc at T9-T10 at the level of the right lateral recess, and abutment upon the anterior right lateral aspect of the thecal sac, mild diffuse disc bulge at L4-L5, however the spinal canal and neural foramina were patent throughout the lumbar spine. The doctor's impression were early degenerative changes at the level of T9-T10 and L4-L5 and no focal disc herniation identified. (T. 426)

Plaintiff went to UAMS due to hot flashes, herpes outbreak, her legs burned and she had foot pain on November 9, 2012. (T. 629) In reviewing her symptoms, Plaintiff denied headaches. Dr. Kramp checked Plaintiff's hormone levels, diabetes, prescribed Acyclovir for genital herpes, and noted her hypertension and migraines were stable on medication. (T. 632)

On November 9, 2012, Plaintiff had an initial evaluation at Perspectives with Dr. Max Baker due to her depression and anger. (T. 563) Plaintiff's past antidepressant medications included: Paxil, Lexapro, Celexa, and Effexor. (T. 563-564) Plaintiff was being treated at the Roland Clinic for chronic opioid abuse, as her addiction began when she took opiates for her back pain. (T. 564)

A review of her symptoms showed Plaintiff only had occasional headaches, joint and back pain, and carpel tunnel syndrome in both hands. (T. 565) Dr. Baker observed Plaintiff was normally dressed and groomed, cooperative, had age appropriate responses, able to maintain focus and complete tasks, not impulsive, however Plaintiff was depressed, and had a sad affect. (T. 566) Plaintiff was assessed with a global assessment of functioning score of 43. (T. 566) Dr. Baker diagnosed Plaintiff with dysthymic disorder and migraines, determined the stressors of her family, social and occupational were moderate. (T. 568)

On January 1, 2013, Plaintiff's evaluation at Perspectives showed low grade sadness most of her life, with daily irritability. Plaintiff was diagnosed with dysthymic disorder, opioid abuse, in remission, headaches, classic migraine type treated by prescriptions. (T. 594) In between cycles, Plaintiff did not attend any therapy appointments, thus there was not a report of progress. (T. 597) The records indicated Plaintiff was to show evidence of a daily routine, including self-care, regular sleep and wake periods, enjoyable recreation, healthy food choices, and physical activity by the end of the review period. (T. 598)

On January 17, 2013, Plaintiff was seen for a follow-up for carpal tunnel syndrome with Dr. Smith. Plaintiff had improved with the use of cock-up splints. Her chief complaint was with her knees. Since Dr. Smith had a difficult time examining her knees, due to her obesity, he ordered an MRI of the left knee, standing anteroposterior of both knees, and lateral of both knees. (T. 690) The results showed subtle tears involving the free edge of the body of the medial meniscus and the undersurface of the posterior horn of the medical meniscus and superficial varicosities medially and laterally at the knee. (T. 692)

Plaintiff saw Dr. Thomas E. Cheyne at Mercy Clinic Sports Medicine Fort Smith, Arkansas on January 24, 2013, for her lower left back pain. (T. 693) Upon examination, Dr. Cheyne observed

Plaintiff was alert and in no acute distress; her mood, affect, and gait were normal. She was tender in the mid and left lower back. Plaintiff could slowly bend to touch above the ankles, she walked on her toes and heels without difficulty, her sensorimotor function in the lower extremities was normal and her deep tendon reflexes were 1+ and equal bilaterally. The X-ray of the lumbar spine indicated mild degenerative changes at L5-S1 and L1-L2. Dr. Cheyne's impression was chronic lumbar myofasciitis, he prescribed Medrol Dosepak and Mobic, advised Plaintiff to take hot showers twice daily, stretch three times a day, and remain active, but protective of her back. (T. 694)

On January 31, 2013, Plaintiff's MRI showed a medial meniscus tear and Dr. Smith opined Plaintiff might need arthroscopy of the left knee in the future and prescribed Tramadol. (T. 697)

Plaintiff had a follow-up examination with Dr. Cheyne on February 21, 2013, where no changes occurred, since Plaintiff had not filled her medications. Dr. Cheyne noted Plaintiff afforded cigarettes, yet could not afford her medications. Plaintiff's instructions were to fill the prescription, take the medicine as directed, perform her exercises, and use heat. Dr. Cheyne noted, if she did not follow the prescribed treatment there was no point for her to return. (T. 698)

On March 25, 2013, Plaintiff had a periodic update to her treatment plan at Perspectives, she was diagnosed with dysthymic disorder, opioid abuse, in remission, headaches, classic migraine type with prescriptions, hypertension, not otherwise specified, chronic pain, and arthritis. (T. 585) Plaintiff attended two therapy appointments during the review cycle and reported symptoms of depression, inability to motivate or complete activities, anxiety, irritability, and lashing out at others related to her diagnosis. (T. 588) Plaintiff felt her irritability had decreased, however she would get agitated at little things and overreact. (T. 591) Plaintiff reported improved symptoms and a better mood. (T. 709)

On August 19, 2013, Plaintiff went to UAMS for a follow-up on her depression and low back pain with activity. The Counselor at Perspectives suggested to change Plaintiff's depression medication from Celexa to Wellbutrin. (T. 714) Plaintiff was counseled about smoking cessation to help with chronic back pain and bone health, prescribed Wellbutrin, and it was noted her hypertension was controlled on medication. (T. 716) Patient was instructed try to do her back exercises in the morning and evening, walk as much as possible, and take all medication as prescribed. (T. 717)

On September 12, 2013, Plaintiff went to UAMS due to dizziness. (T. 722) Since the dizziness was infrequent and not interfering with her life, the staff at UAMS wanted to watch the symptoms. There was a possibility it was the Wellbutrin, however they wanted to give the medication more time to see if the symptoms worsen. (T. 724)

Plaintiff complained of numbness and tingling in both hands during her office visit with Dr. Smith on December 10, 2013. (T. 729) Plaintiff discussed the benefits and risks of carpal tunnel release and decided to have the release. (T. 729)

On January 17, 2014, Plaintiff had right carpal tunnel release. At her follow-up appointment, Plaintiff denied numbness and drainage, until she hit the wound. The wound had not completely healed, but it appeared to be neurovascularly intact. The stiches were left in, the wound redressed and a follow-up appointment made. (T. 733)

The opinion evidence is as follows.

On December 8, 2011, Dr. Clifford Evans performed a general consultative physical examination of the Plaintiff. At the time of the examination, Plaintiff was 5'2" tall and weighed approximately 236 pounds. (T. 258) Plaintiff exhibited full range of motion to the shoulders, elbows, wrists, hands, hips, knees, ankles, and cervical and lumbar spine. (T. 259) Plaintiff did not

9

have muscle spasms, muscle atrophy, sensory abnormalities, or muscle weakness, and her bilateral straight leg raise was negative. Plaintiff's gait and coordination were okay. (T. 260) She was able to hold and pen and write, touch fingertips to palm, oppose thumb to fingers, pick up a coin, stand and walk without assistive devices, walk on heels and toes, squat and rise from a squatting position and she had a normal grip. (T. 260) Dr. Evans diagnosed Plaintiff with mild sacroiliitis, depression by history, obesity, migraine headaches by history, and opiate addiction. (T. 261) Dr. Evans opined Plaintiff did not have significant abnormalities on this physical examination regarding her ability to walk, stand, sit, lift, carry, handle, finger, see hear or speak. (T. 261)

On December 12, 2011, Dr. Stephen A. Whatley, state agency medical consultant, conducted a physical RFC assessment of Plaintiff and determined she was able to occasionally lift and or carry twenty pounds, frequently lift and carry ten pounds, sit, stand and/or walk about six hours in an 8-hour workday, and push and pull, unlimited. Dr. Whatley determined Plaintiff was able to perform a full range of light duty. (T. 263-272) Dr. Bill F. Payne, a state agency medical consultant, reviewed the medical evidence and affirmed Dr. Whatley's assessment on November 14, 2012. (T. 576)

On January 30, 2012, Patricia J. Walz, Ph.D., conducted a mental diagnostic evaluation. When Dr. Walz asked Plaintiff why she applied for disability, Plaintiff responded "I haven't worked in a long time because the kids were at home and I didn't have to. Mom wants me to apply because I have worked and quit a lot of places because of issues with people I worked with. She thinks I've got some issues. I personally don't think I have any." (T. 300) Plaintiff admitted she had depression, did not like people a whole lot, and did not like being in large groups. Dr. Walz observed Plaintiff to be obese, nicely dressed and pleasant. During the evaluation Plaintiff laughed a lot, her mood was hypomanic, affect expansive, speech clear and intelligible, thought processes

10

were a bit circumstantial, and content was not unusual or bizarre. Dr. Walz opined Plaintiff had an average to high IQ and diagnosed her with dysthymia versus bipolar disorder, history of polysubstance dependence currently in treatment, and social phobia. (T. 303) Plaintiff was able to drive, shop independently, clean the house, chase her children; she persisted well and processed information fast. (T. 304)

On March 9, 2012, Dr. Paula Lynch, state agency medical consultant, conducted a mental RFC on the Plaintiff. Dr. Lynch opined Plaintiff's impairments would restrict her to perform tasks where interpersonal contact was routine, but superficial, complexity of tasks was learned by experience; involving several variables, judgment with limits; and supervision that was little for routine tasks, but detailed for non-routine. (T. 315) Diane Kogut, a state agency medical consultant, reviewed the evidence and affirmed Dr. Lynch's assessment on November 13, 2012. (T. 569)

### IV.   Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff has not been disabled from October 20, 2011 through July 26, 2013. Plaintiff argues on appeal the ALJ's RFC assessment was not supported by substantial evidence, the ALJ determined Plaintiff's RFC without considering any medical evidence regarding Plaintiff's ability to function in the workplace, the ALJ did not property take into account Plaintiff's chronic back and knee pain combined with her obesity, the ALJ erred as to the weight of the opinions of treating physicians and consulting physicians, and the ALJ's RFC assessment was conclusory. (Doc. 10, pp. 9-12) The undersigned finds substantial evidence does not support the ALJ's RFC assessment and remand is necessary.

11

**The ALJ's RFC Assessment:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d at 844*; see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC assessment "must be based on medical evidence that addresses the claimant's ability to function in the workplace." "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should seek opinions from a claimant's treating physicians or from consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart,* 361 F. 3d 1066, 1070 (8th Cir. 2004.)

In the present case, Plaintiff suffers from bilateral carpal tunnel syndrome. In May 2012, Dr. Smith observed both hands showed equivocal findings for carpal tunnel syndrome and numbness in the ulnar fifth digit on the left side. (T. 332) Dr. Smith placed Plaintiff in cock-up splints and the Plaintiff improved. In December 2013, Plaintiff complained of numbness and tingling in both

hands and discussed carpal tunnel release with Dr. Smith, who performed the surgery in January 2014 on her right hand. (T. 729, 732) Plaintiff underwent a follow up examination on January 24, 2014, where the wound had not completely healed, but it appeared to be neurovascularly intact. (T. 733)

In the ALJ's RFC he limited Plaintiff to frequent use of her hand and/or fingers. In making this determination, the ALJ took into consideration the nerve conduction study, showing probable carpal tunnel syndrome in the bilateral upper extremities, Plaintiff's condition improved with the use of cock-up splints, and surgery had not been recommended. (T. 19)

The records indicated Plaintiff sought treatment for her carpal tunnel syndrome before and after the ALJ's decision.  After reviewing the record, it appears Plaintiff's carpal tunnel syndrome worsened with time, as Plaintiff had right carpal tunnel release surgery in January 2013.  While the ALJ does take into account her limitations by limiting her use of hands and/or fingers to frequently and not continuously, repetitive tasks that require bending of the wrists or grasping with the hands, including typing, cutting, sewing, playing a musical instrument, overuse of small hand tools, and use of vibrating tools are factors that can contribute to the development of carpal tunnel syndrome.  *See* PHYSICIAN'S DESK REFERENCE, *Carpal Tunnel Syndrome*, http://www.pdrhealth.com/diseases/carpal-tunnel-syndrome (Last accessed May 11, 2015).  It seems reasonable that an individual who has undergone surgical correction for carpal tunnel syndrome might need to avoid these activities, which do not just involve the rapid and repetitive use of their wrists, in order to prevent further complications.  Accordingly, remand is necessary to allow the ALJ to reassess the limitations imposed by Plaintiff's carpal tunnel syndrome and obtain an RFC from Dr. Smith, or an orthopedic surgeon, detailing Plaintiff's limitations and restrictions for her carpal tunnel syndrome.

Plaintiff also suffers from chronic lumbar myofasciitis. (T. 694) In his determination of Plaintiff's RFC, the ALJ relied upon Dr. Evans's 2011 physical examination where Plaintiff demonstrated a full range of motion in both her cervical and lumbar spine; she had a negative bilateral straight leg raise; no muscle atrophy, weakness or edema; a normal gait; and was able to perform all requested limb function tests for Plaintiff's RFC limitations. (T. 17-18) The ALJ also relied upon Dr. Kramp's 2011 physical examination where Plaintiff denied muscle cramps, joint pain, and the examination revealed no deformity or scoliosis in the thoracic or lumbar spine. (T. 17)

Since Dr. Evans's and Dr. Kramp's physical examinations in 2011, Plaintiff had an MRI of her lower lumbar showing early degenerative changes of the lower lumbar spine with desiccation of the disc at level L4-L5, a right paracentral bulging of disc at T9-T10 at the level of the right lateral recess, abutment upon the anterior right lateral aspect of the thecal sac, and a mild diffuse disc bulge at L4-L5. (T. 426) Dr. Cheyne diagnosed her with chronic lumbar myofasciitis and advised Plaintiff to take hot showers twice daily, stretch three times a day, remain active, but protect her back, and prescribed Medrol Dosepack and Mobic. (T. 694)

The ALJ dismissed Plaintiff's subjective complaints of pain by stating the treatment Plaintiff received was conservative. (T. 17) In the Courts opinion, in order for the ALJ to have made an informed decision he should not have relied on a 2011 physical examinations when more current examinations showed Plaintiff's condition had changed; instead, he should have ordered another physical RFC to determine Plaintiff's limitations and restrictions regarding her lower lumbar. *See Gasaway v. Apfel,* 187 F.3d 840, 842 (8th Cir. 1999); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir.2000) ("[I]t is reversible error for an ALJ not to order a consultative examination when such

an evaluation is necessary for him to make an informed decision."(citation and internal quotes omitted)).

The Plaintiff also suffered from a tear involving the free edge of the body of the medial meniscus and the undersurface of the posterior horn of the medial meniscus of the left knee. (T. 692, 697) While the ALJ mentioned the January 2013 MRI in the decision, he relied on Dr. Evans's 2011 physical examination and Dr. Kramp's 2011 physical examination, where Plaintiff demonstrated a full range of motion in all of her joints, in determining Plaintiff's RFC. (T. 17) For the ALJ not to have obtained a more current physical examination or RFC from her treating doctors causes this Court concern.

After reviewing the record, the undersigned finds the ALJ's RFC assessment was not supported by substantial evidence and remand is necessary. On remand, the ALJ is directed to obtain an RFC from Dr. Smith, or another orthopedic surgeon, detailing Plaintiff's limitations and restrictions of her carpal tunnel syndrome, and from Dr. Cheyne, or another sports medicine physician, detailing Plaintiff's limitations and restrictions regarding her lower lumbar and her torn meniscus.

## V.     Conclusion:

Based on the foregoing, I must reverse the decision of the ALJ and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

Dated this 13th day of May, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE